ORIGINAL

FILED
APR 2 9 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | ) | |
| Plaintiff, | ) | Case No. 04- 748C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff, Information Systems & Networks Corporation ("plaintiff" or "ISN"), by its undersigned attorneys, as and for its Complaint, alleges as follows, based on personal knowledge as to its own actions as verified by its President and CEO, and upon information and belief as to the actions of others. For those matters alleged based on ISN's information and belief, such matters are based upon, among other things, the investigation of ISN's attorneys, publicly available documents, and other documents presently available to ISN and its attorneys.

**Nature of Action**

1. Plaintiff brings this action to appeal multiple claims submitted to the cognizant administrative contracting officer ("ACO") on August 1, 2003, pursuant to

the Contracts Disputes Act of 1978, 41 U.S.C. §601-612 as amended ("CDA") ("the CDA Claim"). The CDA Claim sought, inter alia, additional CDA interest which had been miscalculated on an earlier award and payment made to ISN, and unknown and therefore unclaimed contract costs which were omitted in prior litigation between the plaintiff and defendant.

2. As set forth in the CDA Claim, the compensatory amounts due ISN under the designated contract hereinafter described were not claimed in the prior litigation. These unclaimed amounts came to the attention of ISN as a result of certain events in FY 2003. These claims were set forth in the CDA Claim within the applicable statute of limitations under 28 U.S.C. § 2501. None of the claims were covered by or intended to be covered by the Certificate of Finality submitted by ISN in connection with the case before the Armed Services Board of Contract Appeals ("ASBCA")as hereinafter described.

**Jurisdiction**

3. This Court has jurisdiction over ISN's causes of action in that they are derived from the deemed denied decision by the ACO of ISN's CDA Claim. Thus, jurisdiction lies in this Court pursuant to 28 U.S.C. § 1491(a)(1)(2),

Contract Disputes Act of 1978 (as amended) 41 U.S.C. §601-612, as well as FAR 52.216-1, et. seq. The cognizant ACO issued a Final Decision on November 25, 2003. This action is filed within the prescribed time period after the issuance of the Final Decision's denial of ISN's claim.

**The Parties**

4. The plaintiff is a small, minority-owned business, incorporated under the laws of the State of Maryland having its corporate headquarters at 10411 Motor City Drive, Bethesda, MD 20817. ISN is an experienced company in the field of computer/telecommunications/ security systems integration engineering and has been since its inception in 1980. Until recently, it provided services and supplies to the various agencies of the Department of Defense and the United States Government as well as to commercial clients.

5. Defendant is the Government of the United States of America, acting by and through its designated ACO and other authorized representatives, including but not limited to, the Defense Contract Management Agency, the Defense Logistics Agency, and the Defense Contract Audit Agency.

## Factual Allegations

**Background - The Contract**

6. On December 7, 1987, the defendant awarded ISN a fixed price contract in the amount of $3,690,465 to construct an intrusion detection system in Sigonella, Italy. The contract was assigned No. N00612-88-C0185 ("the Contract"). The Contract granted the defendant options to require ISN to construct the same system at three other sites at option prices specified in ISN's bid. These options were subsequently exercised by the defendant requiring ISN to construct the same intrusion detection system at four sites for a total contract price of $12,383,660.

7. ISN's bid included 10% on all other direct costs.

8. The Contract included the standard Default, Termination for Convenience of the Government, Changes-Fixed-Price, and Disputes clauses.

9. On January 9, 1990,the contracting officer decided to terminate the contract for default but waited to issue the termination notice until ISN had delivered its material to the worksites. By contract modification dated June 21, 1990, the contracting officer terminated the

contract for default claiming ISN failed to meet the date for commencing installation and failed to meet required delivery dates for certain technical manuals, engineering drawings, and test procedures. The termination notice required that ISN inventory all material for which title had passed as a result of progress payments having been made.

10. On December 14, 1990, ISN filed a claim certified under the CDA with the contracting officer seeking either breach of contract damages for the allegedly improper termination for default in the amount of $10,239,602 or, in the alternative, termination for convenience costs in the amount of $9,385,885. The contracting officer issued a final decision on April 23, 1991 taking the position that the default termination was proper.

11. After certain procedural issues were resolved between the parties, the defendant unilaterally converted the termination for default to one for the convenience of the defendant. ISN then submitted a convenience termination claim. The parties were unable to reach an agreement on the costs of the termination claim. This resulted in the issuance of a final decision by the

contracting officer. This final decision was then appealed to the ASBCA and docketed as No. 42659 ("the ASBCA Case").

**The ASBCA Opinion and Decision**

12. On November 18, 1999, the Opinion and Decision in the ASBCA Case ("the ASBCA Decision") was issued. The ASBCA Decision addressed the primary issue concerning costs incurred prior to termination and the cost of consumables which had been defined as materials used up or not "left over" during contract performance. The ASBCA Decision also addressed such other issues as ISN's entitlement to legal expenses, termination labor, termination consultants, storage costs, travel expenses, and indirect costs. The ASBCA Decision went on to determine quantum and sustained ISN's appeal in the amount of $515,056. A copy of the ASBCA decision is attached to this Complaint as Exhibit A.

**Payment and Discovery of Other Issues**

13. ISN signed a Certificate of Finality on May 10, 2000. The actual payment made to ISN from the Judgment Fund was in the sum of $394,272.60 because of certain offsets taken by the defendant for amounts due by ISN to the defendant in connection with other contracts.

14. The Certificate of Finality sets forth that CDA interest is allowed from the date the Contracting Officer

received the December 14, 1990 certified convenience termination claim. In addition, the Certificate of Finality states that "[p]ayment shall be a full discharge of the United States of all claims and demand arising out of the matters involved in the claim or controversy." The reference in the Certificate to the "claim" refers to ISN's CDA Claim dated December 14, 1990.

15. In reviewing the ASBCA Decision and ISN's records during an audit of the award in FY 2003, ISN discovered that certain contract costs had not been claimed in either the original CDA claim of December 14, 1990 or the ASBCA Case. As a result, ISN then filed the CDA Claim which is the basis of this Complaint.

16. On November 25, 2003, the cognizant Contracting Officer issued a Final Decision deciding inter alia, that the unclaimed contract costs were barred by the applicable statute of limitations because ISN should have been aware of such claims in 1990. The Final Decision also decided that because the matters had been litigated and decided on by the ASBCA, the Contracting Officer had no authority to issue a Final Decision on those matters.

## COUNT I

## (For Unclaimed Contract Costs)

17. ISN repeats and realleges paragraphs 1 through 16 of this Complaint as if fully set forth herein.

18. ISN claims costs which were not included in its original CDA claim and therefore not asserted in the ASBCA Case in four separate categories:

(a) Installed materials:

Due to erroneous inventories taken by defendant's personnel and misrepresented in the stipulations entered in the ASBCA Case, ISN is entitled to at least $500,000 for materials which were omitted from the stipulated inventory. These costs represent materials actually installed by ISN for which the defendant has not paid ISN.

(b) Other Direct Costs ("ODCs"):

ISN is entitled to ODC's set forth in the audit by the Defense Contract Audit Agency Report on the original contract claim. These costs total $371,151. These costs were not claimed in the ASBCA Case, or in ISN's original certified CDA claim and were not included in any stipulation entered into in the ASBCA Case.

(c) Settlement Expenses:

ISN is entitled to at least $200,000 since the settlement expenses were not related to legal costs which were disallowed by the ASBCA Decision. None of these settlement expenses were claimed in the ASBCA Case or in ISN's original certified CDA Claim.

(d) Post-Termination Costs:

These costs, such as rental costs, and consultant's costs, which are allowed by the Federal Acquisition Regulations were not included in any stipulated amount in ASBCA Case and total more than $360,000.

19. Total unpaid contract claims which were neither asserted in ISN's original certified CDA claim of December 14, 1990 and not asserted in the ASBCA Case are at least $1,456,000.

20. ISN is entitled to judgment against the defendant in the sum of at least $1,456,000 excluding applicable CDA interest.

**COUNT II**

**(For CDA Interest)**

21. ISN repeats and realleges paragraphs 1 through 20 of this Complaint as if fully set forth herein.

22. ISN is entitled to CDA interest on the amounts found to be due and owing under Counts I of this Complaint from August 1, 2003 to when paid at the allowable CDA interest rates.

23. ISN seeks judgment against the defendant in the amount of CDA interest found to be due and owing in the amounts to be determined at the time of payment.

WHEREFORE, the premised considered, plaintiff, Information Systems and Networks Corporation, respectfully demands judgment against the defendant, the United States, as follows

A. On Count I, for judgment in the sum of at least $1,456,000;

B. For CDA interest on the amounts found to be due and owing under Count I;

C. For such other and further relief as this Court may deem proper.

Dated: April 28, 2004

SINGER & ASSOCIATES, PC

NORMAN H. SINGER, ESQUIRE
10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
T. (301) 469-0400
F. (301) 469-0403
Counsel for the Plaintiff

EXHIBIT A

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Information Systems & Networks Corp. | ) | ASBCA No. 42659 |
| | ) | |
| Under Contract No. N00612-88-C-0185 | ) | |

APPEARANCES FOR THE APPELLANT: Bobby D. Melvin, Esq.
John M. Manfredonia, Esq.
Bethesda, MD

APPEARANCE FOR THE GOVERNMENT: Stephen R. Dooley, Esq.
Chief Trial Attorney
Charles Goeke, Esq.
Trial Attorney
Defense Contract Management Command (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE COLDREN

This appeal was taken from a final decision of the contracting officer unilaterally establishing the costs of a termination for convenience. The contract was originally terminated for default by the Government, appealed by appellant to this Board, and docketed as ASBCA No. 41514. Subsequently, appellant filed a certified claim with the contracting officer seeking breach of contract damages or, in the alternative, convenience termination costs. Appellant appealed the failure of the contracting officer to issue a final decision to this Board which was docketed as this appeal. A contracting officer's final decision was then issued on this claim.

The Government unilaterally converted the termination for default to one for the convenience of the Government. ASBCA No. 41514 was then dismissed. At the contracting officer's request, appellant resubmitted its convenience termination claim. The parties were unable to reach an agreement on the costs of performance and settlement, resulting in the final decision of the contracting officer at issue in this appeal. At the request of appellant, the prior appeal in ASBCA No. 42659 was reinstated.

Four days of hearing were held. During this hearing, the parties settled many of the issues in dispute.

## FINDINGS OF FACT

A. *The Contract*

1. On 7 December 1987, the Government awarded the appellant a fixed price contract in the amount of $3,690,465 to construct an intrusion detection system in Sigonella, Italy (ex. A-104). The contract granted the Government options to require the appellant to construct the same system at three other sites at option prices specified in appellant's bid (*id.*). These options were subsequently exercised by the Government requiring the appellant to construct the same intrusion detection system at four sites for a total contract price of $12,383,660 (exs. A-104, -105).

2. Appellant's bid included no profit on the cost of materials but 10% on all other direct costs (ex. A-103; tr. 1/25).

3. The contract included the standard Default (Fixed-Price Supply and Service) (FAR 52.249-8, APR 1984); Termination for Convenience of the Government (Fixed-Price) (FAR 52.249-2, APR 1984); Changes - Fixed-Price (FAR 52.243, APR 1984); and Disputes Alternate I (FAR 52.233-1 ALT I, APR 1984) clauses. (Ex. A-104) The Default clause provides in pertinent part:

> (e) If this contract is terminated for default, the Government may require the contractor to transfer title and deliver to the Government, as directed by the Contracting Officer, any (1) completed supplies, and (2) partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (collectively referred to as "manufacturing materials" in this clause) that the Contractor has specifically produced or acquired for the terminated portion of this contract. Upon direction of the Contracting Officer, the Contractor shall also protect and preserve property in its possession in which the Government has an interest.
>
> (f) The Government shall pay [sic] contract price for completed supplies delivered and accepted. The Contractor and Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property. Failure to agree will be a dispute under the Disputes clause.

> (g) If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

The Termination for Convenience provision also indicates:

> (b) After receipt of a Notice of Termination, and except as directed by the Contracting Officer, the Contractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this clause:
>
> * * *
>
> (6) As directed by the Contracting Officer, transfer title and deliver to the Government (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced or acquired for the work terminated, and (ii) the completed or partially completed plans, drawings, information, and other property that, if the contract had been completed, would be required to be furnished to the Government.
>
> * * *
>
> (8) Take any action that may be necessary, or that the Contracting Officer may direct, for the protection and preservation of the property related to this contract that is in the possession of the Contractor and in which the Government has or may acquire an interest.
>
> * * *
>
> (d) After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Contractor shall submit the proposal

promptly, but no later than 1 year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Contractor within this 1-year period.

* * *

(f) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of the work, the Contracting Officer shall pay the Contractor the amount determined by the Contracting Officer as follows . . .:

* * *

(2) The total of –

(i) The costs incurred in the performance of the work terminated . . .;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract . . .; and

(iii) A sum, as profit on subdivision (i) above . . .

(3) The reasonable costs of settlement of the work terminated, including—

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts . . .; and

(iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

* * *

(j) In arriving at the amount due the Contractor under this clause, there shall be deducted—

(1) All unliquidated advance or other payments to the Contractor under the terminated portion of this contract;

4. The Federal Acquisition Regulation (FAR) in effect at the time of contract award provides at FAR 31.205-42, 48 CFR §31.205-42 (1986), as follows:

> Contract terminations generally give rise to the incurrence of costs or the need for special treatment of costs that would not have arisen had the contract not been terminated. The following cost principles peculiar to termination situations are to be used in conjunction with the other cost principles in Subpart 31.2:
>
> * * *
>
> (b) *Costs continuing after termination*. Despite all reasonable efforts by the contractor, costs which cannot be discontinued immediately after the effective date of termination are generally allowable. However, any costs continuing after the effective date of the termination due to the negligent or willful failure of the contractor to discontinue the costs shall be unallowable.
>
> * * *
>
> (e) *Rental under unexpired leases*. Rental costs under unexpired leases, less the residual value of such leases, are generally allowable when shown to have been reasonably necessary for the performance of the terminated contract, if--
>
> (1) The amount of rental claimed does not exceed the reasonable use value of the property leased for the period of the contract and such further period as may be reasonable; and
>
> (2) The contractor makes all reasonable efforts to terminate, assign, settle, or otherwise reduce the cost of such lease.

* * *

(g) *Settlement expenses*. (1) Settlement expenses, including the following, are generally allowable:

(i) Accounting, legal, clerical, and similar costs reasonably necessary for--

(A) The preparation and presentation, including supporting data, of settlement claims to the contracting officer; and

(B) The termination and settlement of subcontracts.

(ii) Reasonable costs for the storage, transportation, protection, and disposition of property acquired or produced for the contract.

(iii) Indirect costs related to salary and wages incurred as settlement expenses in (i) and (ii); normally, such indirect costs shall be limited to payroll taxes, fringe benefits, occupancy costs, and immediate supervision costs.

(2) If settlement expenses are significant, a cost account or work order shall be established to separately identify and accumulate them.

(h) *Subcontractor claims*. Subcontractor claims, including the allocable portion of the claims common to the contract and to other work of the contractor, are generally allowable. An appropriate share of the contractor's indirect expense may be allocated to the amount of settlements with subcontractors; provided, that the amount allocated is reasonably proportionate to the relative benefits received and is otherwise consistent with 31.201-4 and 31.203(c). The indirect expense so allocated shall exclude the same and similar costs claimed directly or indirectly as settlement expenses.

FAR 31.201-2, 48 CFR §31.201-2 (1978), provides as follows:

(a) The factors to be considered in determining whether a cost is allowable include the following:

> (1) Reasonableness.
>
> (2) Allocability.
>
> * * *
>
> (4) Terms of the contract.
>
> (5) Any limitations set forth in this subpart.

FAR 31.202-3 provides as follows:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.
>
> * * *
>
> (b) What is reasonable depends upon a variety of considerations and circumstances, including –
>
> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

FAR 31.201-4 provides as follows:

> A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it--
>
> (a) Is incurred specifically for the contract;
>
> (b) Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or

> (c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

FAR 31.205-33 provides as follows:

> (a) Costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill . . . are allowable . . . when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government (but see 31.205-30 and 31.205-47).
>
> * * *
>
> (d) Costs of legal, accounting, and consultant services and directly associated costs incurred in connection with organization and reorganization (also see 31.205-27), defense of antitrust suits, defense against Government claims or appeals, or the prosecution of claims or appeals against the Government (see 33.201) are unallowable (but see 31.205-47).

FAR 31.205-30 involves costs pertaining to the patents which are not involved in this appeal.

B. *Termination for Default*

5. On 9 January 1990, the contracting officer decided to terminate the contract for default but to wait to issue the termination notice until appellant delivered its materials to one of the work sites (ex. A-114).

6. By Contract Modification No. P00017 dated 21 June 1990, the contracting officer terminated the contract for default for failing to meet the date for commencing installation and for failing to meet required delivery dates for certain technical manuals, engineering drawings, and test procedures (ex. A-105). The termination notice required that appellant inventory all material for which title had passed as a result of progress payments having been made (*id.*).

7. Appellant engaged the law firm of Epstein and Becker to dispute the termination for default (tr. 1/43). The law firm formally responded to the default termination with a legal memorandum dated 29 June 1990 arguing in detail why the contract should be reinstated or the default converted to one for the convenience of the Government (ex. A-121). It also conducted all discussions with the Government advocating either reinstating the contract or converting the default termination to one for the convenience of the Government (tr. 1/43-44).

8. On 21 September 1990, appellant through its attorneys, Epstein and Becker, filed an appeal to this Board from the final decision of the contracting officer terminating the contract for default (ex. A-117, Attachment 1; tr. 1/43-44). It filed a complaint setting forth in detail why the termination was improper and further contended that any excess costs were improper because the reprocurement terms were changed and the resulting contract was awarded sole source without competition.

9. By a letter dated 14 December 1990, Epstein and Becker on behalf of appellant filed a claim certified under the Contract Disputes Act with the contracting officer seeking either breach of contract damages for the allegedly improper termination for default in the amount of $10,239,602 or, in the alternative, termination for convenience costs in the amount of $9,385,885 (ex. A-117). When the contracting officer failed to issue a final decision or advise appellant when he would issue a decision, appellant took an appeal from the deemed denial of its claim to this Board which was docketed as ASBCA No. 42659. The contracting officer subsequently issued a final decision dated 23 April 1991 taking the position that the default termination was proper (ex. A-74). This Board dismissed ASBCA No. 42659 without prejudice on 19 November 1991 as being premature.

C. *Termination Inventories*

10. At the time of termination, appellant had 40 to 50 employees working on the site at Roosevelt Roads in Puerto Rico and others at a 10,000 square foot warehouse in Charleston, South Carolina (tr. 1/44, 152). Shortly after the termination, appellant commenced notifying its vendors and subcontractors that their services or delivery requirements were also terminated (tr. 1/45). Appellant completed the tasks required by the termination notice including documentation requirements such as preparing an inventory of all materials for the contract over a period of about 4 weeks (tr. 1/44-45, 152-53). It collected all of the equipment and materials, tagged them, and placed and secured them in three containers at the Roosevelt Roads site (tr. 1/153, 3/153-54). It terminated all of the local Puerto Rican employees, sold its vehicles, and closed its office there (*id.*). It then performed a similar function at Charleston (tr. 3/154). It then terminated many of the employees there (tr. 3/155).

11. By a letter dated 6 July 1990, the contracting officer directed that appellant inventory all of the materials purchased for use under the contract, furnish a list of that inventory by 13 July 1990, and turn over this inventory by 16 July 1990 (exs. A-46, -49). Appellant prepared and furnished an inventory list dated 13 July 1990 (tr. 3/210-11; ex. A-48). It advised the Government that the list was only a partial inventory because it had been unable to complete that work but that a list would be completed by the end of July (ex. A-50). It also proposed negotiations in mid-August to determine the value of that inventory (*id.*).

12. Appellant completed its list of materials by the end of July but was unable to determine the value of that inventory until it matched the descriptions of the material with purchase orders at appellant's headquarters (ex. A-50). Its Vice President, James Hickey, spent a tremendous amount of time managing this matching of inventory to purchase orders (tr. 3/209-11). Appellant's employees doing this matching were not the ones who prepared the inventory descriptions at the work sites (tr. 3/211). Its Vice President, Hilmi Arslan, managed the listing portion of the taking of the inventory (tr. 3/153-54).

13. By a letter dated 15 January 1991, the Government directed that appellant transfer the inventoried material at Roosevelt Roads to the Government or remove them; and further warned that if this was not accomplished by 31 January 1991 the Government would take possession and in return grant appellant a credit in the amount of $1,546,645.34 against the progress payments previously made to appellant (ex. A-61). Appellant responded in a letter dated 17 January 1991 that the Government settlement offer of 15 January to take possession of the inventory and credit appellant with a portion of the progress payments previously made was unacceptable and requested a meeting to negotiate the value of the inventory before transferring it to the Government (ex. A-62). The Government replied in a letter dated 22 January 1991 that it already owned the inventory by virtue of the prior progress payments made to appellant, that negotiations were unnecessary, and demanded that appellant transfer the inventory by 8 February (ex. A-63). It repeated these assertions in another letter dated 29 January 1991 demanding immediate custody of the inventory at Roosevelt Roads stating that it had a right to immediate possession with the value to be negotiated at a later time (ex. A-64).

14. By a letter dated 29 January 1991, appellant disputed the Government's claim that it had paid for the inventory claiming that appellant had incurred substantially more material costs than had been paid by the Government in progress payments and demanded negotiations over the value of the inventory before it would transfer that inventory (ex. A-65). The Government in a letter dated 14 February warned appellant that its need for the inventory was for use by the reprocurement contractor which would disappear as that contractor's performance progressed (ex. A-66). It argued it had a right to possession of

the inventory under the contract independent of negotiation of its value but offered $1,546,645.34 for the inventory (*id.*).

15. By a letter dated 4 March 1991, the Government reiterated to appellant that it had a right to the inventory under the terms of the Default clause without negotiating its value (ex. A-68). The letter further stated that no useful meeting to conduct negotiations over the value of the inventory could take place until the Government was informed of the location of all of this inventory and exactly how appellant calculated its value including looking at the invoices used to establish value (*id.*). It also pointed out that the Government should be permitted to perform its own inventory of material and equipment rather than having to rely on appellant (*id.*).

16. Appellant responded in a letter dated 6 March 1991 that all of the inventory was at Roosevelt Roads and Charleston, granted permission to inventory any materials or equipment by coordinating with appellant's contract administrator, and stated that its certified, termination for convenience claim indicated exactly how it established the value of the inventory (ex. A-69). Appellant's attorney in a letter 5 March 1991 to Navy Counsel at Charleston indicated that the value of the inventory was $7.7 million, that the certified, termination for convenience claim indicates how the inventory value was determined, and that copies of all of the invoices for the purchased inventory had been provided to the Government (*id.*).

17. By a letter dated 7 March 1991, the Government requested that appellant prepare a list of all of the inventory identifying each item, its location, quantity, unit price, and describing the invoice for that item (ex. A-71). It did not direct that appellant perform a new inventory as alleged by appellant but only a complete list of the prior inventory (*id.*).

18. Appellant in a letter dated 12 March 1991 to the Government attached a list of the inventory as requested by the Government (ex. A-72). Its letter indicated that the cost of the inventory was $7.7 million with $4.1 million covered by prior progress payments but that $3.6 million in additional payments had to be made (*id.*). It sent a letter dated 25 March 1991 indicating its desire to settle and stating it was awaiting a response to its 12 March settlement offer (ex. A-73).

19. Appellant stored 28 balanced magnetic switches which had been furnished as Government furnished equipment in the four inventory storage containers at Roosevelt Road (ex. A-75). Appellant authorized the Government to remove the locks on the four storage containers and retrieve these switches (ex. G-2). Appellant's president testified that the Government confiscated the inventory at Roosevelt Roads when it retrieved the switches (tr. 1/96).

D. *Conversion of Default Termination*

20. By unilateral Contract Modification No. P00020 dated 3 January 1992, the contracting officer retroactively converted the termination for default to one for the convenience of the Government effective 21 June 1990 (Gov't Supp. R4, tab 1; ex. A-79). The Board dismissed ASBCA No. 41514 on 11 May 1992.

21. The termination contracting officer directed that appellant resubmit its termination for convenience proposal in a specified format (tr. 1/82-83). A revised termination for convenience proposal was submitted on 28 July 1992 (Supp. R4, tab 2).

E. *Termination for Convenience Inventory*

22. In 1992, appellant re-performed the inventory at its warehouse in Charleston to verify the accuracy of the prior inventory so that the inventory could be submitted with its revised termination for convenience proposal (tr. 3/155). Hilmi Arslan was not present but managed the taking of this new inventory (*id.*). The inventory was repeated in February and April of 1994 in the presence of Government personnel due to Government complaints about the accuracy of the prior inventory (tr. 3/155-56, 4/15-16, 27; ex. G-3). Mr. Arslan was present (*id.*). More equipment and materials were discovered than had previously been identified by appellant (tr. 4/16, 27). During this period, the Government sent trucks to the Charleston warehouse in February of 1994 in an attempt to pick up the inventory but appellant refused to release the materials until the parties agreed upon its value (tr. 4/15-16). It subsequently again sent trucks to the warehouse to pickup the inventory but appellant's landlord refused to release the inventory because of its dispute with appellant over unpaid rent (tr. 4/20). Appellant's president testified that appellant did not intend to release the inventory before appellant was first paid for the value of that inventory (tr. 4/174-76). Her rationale for requiring payment before transfer was to use the inventory as leverage to encourage the Government to settle the dispute (tr. 3/216).

23. Appellant turned over the inventory in Charleston to the Government on 6 December 1994 (tr. 4/17, 21).

F. *Termination Legal Fees*

24. Appellant paid fees totaling $69,522 for legal services to litigate the termination for default (ASBCA No. 41514) before the ASBCA and to assist it with termination tasks as invoiced by its attorneys, Epstein, Becker & Green and paid with canceled checks included in this record (ex. A-1 at Sections 2 & 5). Of these fees, Epstein, Becker & Green's invoices dated 2, 13, 17 July 1990, 6, and 15 August 1990

clearly indicate that $1,350 of these services was for advice concerning the performance of the inventory during the fiscal year 1990; and that those for 19-21 November 1990, 7 December 1990, 15, 24 January 1991, 7-8, 14, 25-26 February 1991, 12, 25 March 1991, and 8 July 1991 show that $1,802 was for the same services in fiscal 1991 (*id.*). Its invoices dated 19, 21, 21-30 November 1990, 3-6, 10-14 December 1990, 25 March 1991, and 3, 15, 28, 30 May 1991 also clearly indicate that $9,151 was for the preparation of and advice concerning the preparation of the termination for convenience proposal for fiscal 1991 (*id.*). Thus, the non-litigation legal fees of Epstein, Becker & Green were $12,303 with $1,350 being for fiscal 1990 and the remaining $10,953 for fiscal 1991.

25. Appellant paid fees totaling $74,415.75 for legal services to litigate the termination for default (ASBCA No. 41514) before the ASBCA and to assist it with termination tasks as invoiced by its additional attorneys, Pettit & Martin, and paid with canceled checks included in this record (ex. A-1 at Sections 7 & 8). Of these fees, Pettit & Martin's invoices dated 18-19 February 1992 clearly indicate that $295 of these services was for advice concerning the performance of the inventory for fiscal 1992 (*id.*). Its invoices dated 3, 5-6, 8 January 1992, 30 June 1992, and 20-24, 27-28 July 1992 also clearly indicate that $4,900 was for the preparation of and advice concerning the preparation of the termination for convenience proposal for fiscal 1992; and those for 4-6, 12 October 1993 show that $1,828 was for the same services for fiscal 1994 (*id.*). Finally, its invoices dated 16 January 1992 clearly establish that $345 is for legal services for fiscal 1992 concerning an audit of appellant's termination for convenience proposal (*id.*). Thus, the non-litigation legal fees of Pettit & Martin were $7,368 with those for fiscal 1992 being $5,540 and those for fiscal 1994 being $1,828.

26. The total for non-litigation legal fees concerning the termination were $19,671 (findings 24, 25).

G. *Reprocurement Bid Protest*

27. Appellant's president learned that the Government was initiating a reprocurement of the work remaining under its terminated contract from unsuccessful prior bidders under its contract who were telephoning appellant to learn what had happened (tr. 1/55). Appellant was not solicited and was told by the Government that its account would be charged for any excess costs caused by the re-procurement (tr. 1/55-56). However, its attorneys, Epstein, Becker & Green, by a letter dated 19 July 1990 to the contracting officer requested that appellant be provided a copy of the re-solicitation and that it be permitted to bid (ex. A-55 at ex. B).

28. On 25 July 1990, appellant submitted an unsolicited bid on the re-procurement contract in the amount of $11,998,208 (ex. A-51). The Government summarily rejected

appellant's bid and awarded the re-procurement contract to Vitro Corporation at a price much higher than that of appellant (tr. 1/56).

29. On 26 July 1990, appellant's attorneys, Epstein, Becker & Green, filed a protest of the award of the re-procurement contract to Vitro Corporation to the General Services Board of Contract Appeals (GSBCA) (ex. A-55). The protest claimed that the award was an illegal sole source contract and that the summary rejection of appellant's bid as being non-responsible was improper because appellant was a small business entitled to have this matter determined by the Small Business Administration.

30. On 1 October 1990, the GSBCA dismissed appellant's protest for lack of jurisdiction because the re-procurement contract was the "direct fulfillment of a military mission" as providing necessary security from threats of terrorism to U. S. foreign military bases (ex. A-56). Appellant appealed this decision of the GSBCA to the United States Court of Appeals for the Federal Circuit on 19 December 1990 (ex. A-57).

31. Appellant paid fees totaling $83,698 for legal services to litigate its bid protest before the GSBCA and to appeal the dismissal of that protest to the Court of Appeals for the Federal Circuit as invoiced by its attorneys, Epstein, Becker & Green and paid with canceled checks included in this record (ex. A-1 at Sections 2 & 4). We find that these fees did not involve Contract Disputes Act claim litigation but the remedy being sought was to secure a different contract even though this reprocurement would not have occurred had this contract not been terminated.

H. *Bell South Telesensor Litigation*

32. Appellant had a subcontract with Bell South Telesensor under which Bell South was to furnish a monitor and control system for each of the security systems to be installed at the four Navy bases (ex. A-97 at 3). The monitor and control system was the "control core" of the various security systems (*id.*).

33. Prior to the termination for default, Bell South Telesensor had delivered various components of the monitor and control system to appellant (ex. A-97 at 4). Both Bell South and appellant agreed that the monitor and control system delivered to appellant was not in conformity with the subcontract or the contract at issue here (*id.*; tr. 3/219). They agreed that if Bell South corrected the non-deformities by 31 May 1990 that appellant would pay the contract price by 4 June 1990 (*id.* at 5-6). They worked over a period of time in an attempt to turn the monitor and control system into conforming goods but were unable to do so (*id.* at 4-6).

34. On 6 June 1990, Bell South filed suit for the subcontract price of $727,714.23 in the United States District Court for the District of Maryland (ex. A-97 at 5). Shortly thereafter, appellant sent back the monitor and control system to Bell South as non-conforming goods (*id.* at 6-7). Appellant then filed a counterclaim in the amount of $344,086.72 for its costs of working with Bell South in an attempt to bring the monitor and control system into conformance and for the damages it incurred because the Government terminated its contract for default allegedly due to the problems with the monitor and control system (*id.* at 6; ex. A-76).

35. After a trial without a jury, the United States District Court ruled that the monitor and control system furnished by Bell South was non-conforming, that appellant had properly revoked its acceptance of that control system, and that appellant was not liable for the subcontract price (ex. A-81, -97 at 7). It also denied appellant's counterclaim against Bell South (*id.*).

36. Bell South appealed to the United States Court of Appeals for the Fourth Circuit (ex. A-97 at 7). The Court of Appeals affirmed the District Court by applying the Uniform Commercial Code in effect in Maryland in holding that appellant had accepted the monitor and control system on the reasonable expectation that its non-conformities would be corrected, that they were not, and that the appellant reasonably revoked its acceptance and returned the goods (*id.*).

37. Epstein, Becker & Green represented appellant in the Bell South litigation until Petitt & Martin took over (tr. 1/46). Both law firms were instructed to document their time by activity (tr. 1/46-47). Their position that appellant did not have to pay for non-conforming goods was sustained by the courts (tr. 1/126-28). Epstein, Becker & Green represented appellant from October 1990 until October 1991 and invoices and canceled checks support that it was paid $117,006 for its efforts during fiscal year 1991 (ex. A-1 at Sections 2 & 3). Petitt & Martin represented appellant from April 1992 until September 1994 including an appeal to the Fourth Circuit and invoices and canceled checks support that Pettit & Martin was paid $236,945 for its efforts with $177,598 being paid in fiscal 1992, $49,347 being paid in fiscal 1993, and $10,000 being paid in fiscal 1994 (ex. A-1 at Section 9). No evidence was included in the record that these attorney fees were unreasonable or that appellant abused its business judgment in securing and paying for these services. Appellant paid a total of $353,950 in attorneys fees for its litigation with its subcontractor Bell South.

I. *Warehouse Rental Charges & Litigation Expenses*

38. On 25 July 1990, appellant entered into a one year lease with Weims Court Associates for the warehouse in Charleston described in finding 10 at a monthly rent of

$2,187.50 (ex. A-92). After 6 months, appellant could terminate that lease by providing 30 days written notice to Weims Court Associates (*id.*). It could also convert that lease to a month to month lease if appellant held over after the one year lease term which was also terminable by 30 days written notice (*id.*).

39. Appellant seeks the rental costs it paid Weims Court Associates for storing the inventory from the time of the termination for default on 21 June 1990 (finding 6) until the inventory was turned over to the Government on 6 December 1994 (finding 23). This amounts to $117,612 which is 54 months at the monthly rent of $2,178. The long delay in transferring the inventory housed in the warehouse in Charleston from appellant to the Government was due to a dispute over whether the value of that inventory was greater than the progress payments the Government had previously paid appellant with the appellant demanding that it be paid for its alleged additional value prior to transfer (findings 6 to 23).

40. Appellant and the Government arranged for the Government to pick up the inventory in the warehouse in Charleston (tr. 1/104). Appellant then arranged with Weims Court Associates to vacate a portion of the rented warehouse space for a rent reduction (tr. 1/129-30; ex. A-96 at ¶ 5). The transfer of the inventory did not take place at the arranged time (*id.* at ¶ 6; tr. 1/104-05, 130). Weims Court Associates demanded the increased rent it expected to collect from the new tenant for the space that was to be vacated (tr. 1/105). Weims Court Associates also denied access to the leased space to appellant and the Government (tr. 1/130; ex. G-3 at ¶ 2). Appellant then stopped paying rent to Weims Court Associates in July of 1994 (tr. 1/131; ex. A-96 at ¶ 8). Weims Court Associates then sued appellant for the unpaid rent for July through December of 1994 (*id.*). Appellant also seeks its attorney fees to defend against this suit.

41. Appellant recorded warehouse rental charges of approximately $26,000 to its overhead pool rather than as a direct cost from the date of the default termination on 21 June 1990 until 31 December 1991 (tr. 4/109-10; Supp. R4, tab 5 at 23; ex. G-13). The Government DCAA auditor questioned appellant's attempt to convert these from indirect to direct costs, claiming that most of these costs had already been recovered under other contracts through the application of overhead (tr. 4/105; Supp. R4, tab 5 at 23; ex. G-13). No proof of this recovery was included in the record. On the other hand, no proof was included in the record as to when final G&A rates were established with DCAA and the accounting practice continued long after the close of the fiscal year without any proof that any adjustment was made for rent previously recovered as G&A. Thus, we are unable to determine that the rent for the period prior to 31 December 1991 was not previously recovered as G&A. Rents for the period from 1 January 1992 through 6 December 1994 were not included in G&A.

42. Appellant utilized the warehouse in Charleston to store inventory for another contract as well as this one (tr. 4/24). Appellant claimed that 90% of the space was utilized for storage of inventory for this contract (Supp. R4, tab 5 at 23). The Government project engineer is the only witness with personal knowledge of the warehouse space who testified and she indicated that 75% of the space was used for this contract (tr. 4/23-25). We find that 75% is the correct figure and that the portion of the monthly rent applicable to this contract is 75% of $2,187.50 which equals $1,641 (finding 38).

43. Appellant retained the law firm of Anderson and Cleveland to defend appellant in the suit for unpaid rent filed by Weims Court Associates and this firm's estimated fees were $7,500 (ex. A-1 at Section 12). No other proof was included in the record as to legal fees for Anderson and Cleveland.

J. *Electrical Wire Litigation*

44. Appellant issued a purchase order to Perry Mann Electric Company, Inc. for electrical wiring necessary for the performance of this contract at a price of $122,942 (ex. G-20 at 1). The purchase order contained a standard clause stating that payment was due at the later of 45 days after acceptance of the ordered materials or 15 days after appellant was paid by the Government (*id.* at 2, 3). It also contained a written term on its front stating "Net 60."

45. After the contract was terminated, appellant notified Perry Mann that the contract had been terminated, that the ordered wiring had not been used, and requested that it be permitted to return the wiring to Perry Mann (tr. 1/108-09). Perry Mann refused to permit the return of the wiring and sued appellant for the purchase order price (*id.*). Appellant defended on the ground that it did not owe Perry Mann until 15 days after Government payment for the wiring (ex. G-20 at 2). Perry Mann's position was that payment was due 60 days after acceptance based upon the purchase order's hand written term "Net 60." (I*d.*)

46. The United States District Court for the District of South Carolina held that the term "Net 60" reflected the practice in the electrical equipment industry that payment would be made within 60 days of acceptance or submission of invoice (ex. G-20 at 3-4). It relied on an affidavit of an employee of appellant who had negotiated the terms of the purchase order which stated that this was what the parties agreed to (*id.*). Accordingly, it held that appellant owed Perry Mann for the wiring (*id.*).

47. Appellant paid Perry Mann for the wiring (tr. 1/108). Appellant then delivered that wiring to the Government (tr. 1/108-09).

48. Appellant was represented by the South Carolina law firm of Clawson and Straubes as well as Epstein, Becker & Green in the law suit over the payment for the electrical wiring and paid $1,227 to Epstein, Becker & Green for fiscal 1991 (ex. A-1 at Sections 2 & 6) and $8,404 to Clawson and Straubes for that representation with $1,009 being for fiscal 1990 and $7,395 being for fiscal 1991 (ex. A-1 at Section 1). No evidence was included in that record that these fees were unreasonable or that appellant used unreasonable business judgment in securing these legal services. We find that appellant paid a total of $9,631 for these legal services.

K. *Direct Materials and Equipment*

49. At the hearing, the parties stipulated that the value of the inventory at Charleston (Schedule A) was $1,668,994; the value of the inventory at Roosevelt Roads (Schedule B) was $1,450,965; and the value of the installed materials at Roosevelt Roads (Schedule C) was $91,497; resulting in total direct material costs of $3,211,456 (tr. 3/5). They also stipulated that the G&A rate to be applied to these materials was 11.62% (*id.*).

L. *Other Direct Costs*

50. Except for consumables which remain in dispute, the parties have stipulated that the other direct costs of performance were $530,918 with $133,995 being for fiscal year 1988, $175,774 being for fiscal 1989, and $221,149 being for fiscal 1990 (tr. 3/88).

M. *Consumables*

51. Consumables are items, such as pens, pencils, paper, pads, and gasoline for trucks, which are used up during contract performance and not "left over." (Tr. 3/89)

52. DCAA informed appellant that it was entitled to recover for consumables if it could identify them and demonstrate their cost (tr. 3/212-13). Appellant prepared a report from its computerized accounting data base of consumables for this contract which totaled $52,567.79 (ex. G-5). DCAA audited this report and determined that $47,887.79 was supportable with $4,680 being questioned because a credit was reflected in a purchase order for some of these materials (*id.*). The contracting officer approved the $47,887.79 in her final decision (Supp. R4, tab 8). In its complaint filed in this appeal, appellant sought the $52,567 that it had originally proposed to DCAA.

53. At the hearing and in its brief, appellant increased the amount it seeks for consumables from the $52,567 to $542,814.22 by utilizing a total cost method. It subtracted the $3,211,456 stipulated at the hearing for direct materials listed in Schedules

A, B, and C from the $3,578,082.22 recorded in its accounting system for direct materials which equals $366,626.22. It added the $176,188 questioned by DCAA in other direct costs as being duplicative of costs recorded as a part of the inventory to this $366,626.22 to arrive at the $542,814.22. This necessitates a review of how appellant's material costs are recorded in its accounting system as well as how the parties arrived at the stipulation for Schedules A, B, and C.

54. Appellant's second termination for convenience proposal dated 21 July 1992 sought $3,403,879.00 for the direct material costs of performance composed of the inventory at Charleston (Schedule A) in the amount of $1,745,329.00; at Roosevelt Roads (Schedule B) in the amount of $1,447,065.00; and installed equipment at Roosevelt Roads (Schedule C) in the amount of $211,485.00. Page 2 of its cover letter states that appellant's "cost for Direct Material was calculated based on a physical inventory of the equipment." Appellant's convenience termination proposal did not seek any direct material costs not included in the physical inventories presented in Schedules A, B, and C.

55. In the audit report dated 15 October 1993, the Defense Contract Audit Agency (DCAA) questioned $333,596 of the $3,403,879 claimed for direct materials of contract performance by appellant in its second termination for convenience claim (Supp. R4, tab 4 at 6). Schedule A-1 of the report goes through Inventories A, B, and C on an item by item basis reviewing purchase orders, invoices, and canceled checks pointing out where the claimed costs are not supported by these backup materials (*id.* at 12-18).

56. By a letter dated 5 November 1993 and attachments, appellant advised the contracting officer that it agreed with $20,428 of the DCAA exception to $333,596 of the $3,403,879 for direct materials of contract performance claimed by appellant in its second termination for convenience claim but disagreed with the remainder (ex. A-89 - attach. at 1). Appellant claimed that its accounting records indicated material costs of performance of $3,578,080 and that the difference between this figure and the adjusted claimed inventory costs of $3,383,451 was consumables in the amount of $194,629 for which appellant was entitled to compensation even though not included in its termination for convenience claim (*id.*). Thus, appellant added the $20,428 of the exception it agreed with in the DCAA report to consumables which it now claimed for the first time.

57. In a supplementary audit report dated 11 May 1994, DCAA reduced the questioned material costs of performance from $333,596 to $295,379 (Supp. R4, tab 5 at 13-18). In addition, DCAA questioned $176,188 of appellant's proposed other direct costs because they were duplicative of items included in Schedules A, B, and C for direct materials and equipment costs (Supp. R4, tab 5 at 19). This is the $176,188 that appellant then added to consumables at the hearing.

58. By a letter dated 26 September 1994, the termination contracting officer offered appellant $3,234,609 of the $3,578,080 sought (Supp. R4, tab 6). Appellant responded by a letter dated 27 October 1994 that a new inventory resulted in $3,576,689 of direct materials with $1,918,139 being for equipment located in Charleston (Schedule A); $1,447,065 for equipment located at Roosevelt Roads (Schedule B); and $211,485 for equipment installed at Roosevelt Roads (Schedule C) (Supp. R4, tab 7). It argued that its figures were based on a physical inventory count and pricing using paid invoices (*id.*).

59. By unilateral Modification No. A00002 dated 14 February 1995, the contracting officer issued a final decision pricing the convenience termination (Supp. R4, tab 8). The direct material costs unilaterally established by the contracting officer were $3,291,356 of the $3,576,689 claimed including $1,589,200 for equipment warehoused at Charleston (Schedule A); $102,131 additional inventory located at Charleston; $47,888 for documented consumables; $1,447,065 for equipment at Roosevelt Roads (Schedule B); and $105,072 for equipment installed at Roosevelt Roads (Schedule C) (*id.*).

60. In its complaint filed in this appeal, appellant sought $3,576,689 for direct materials of performance which included $1,918,139 (Schedule A); $1,447,065 (Schedule B); and $211,485 (Schedule C) (complaint at 10-11). It also sought $52,567 for consumables as a part of other direct costs (*id.* at 14).

61. As previously stated, the parties stipulated at the hearing on the value of the inventories reflected in Schedules A, B, and C (finding 49). The $176,188 found by DCAA to be duplicative of items in these inventories was clearly a part of that stipulation and cannot be reclaimed as a consumable (findings 53, 57). Thus, the issue remains as to whether the remaining $366,626.22 of the $542,814.22 is recoverable.

62. Appellant's termination for convenience proposal as well as its complaint filed in this appeal clearly indicate that the appellant's direct material costs were solely those presented on Schedules A, B, and C (findings 54, 60). Appellant in its proposed finding 67 points out that its computerized accounting records contain over $30,000 for concrete not listed in Schedules A, B, and C and over $100,000 more than the fencing listed in these inventory schedules. No evidence was included in the record as to where any fencing not listed in these inventory schedules is located nor what happened to the concrete, both of which, if paid for, are or would be Government property. More importantly, the direct material portion of appellant's termination claim was stipulated. Thus, we find these materials cannot be added as consumables.

63. Appellant's vice president testified that consumables should have been recorded in appellant's computerized accounting system as "other direct costs" and not

been recorded as "direct materials" of performance (tr. 3/162, 169-71). Appellant recorded the costs of materials and equipment it purchased for use on this contract in its computerized accounting system when it issued purchase orders for them (tr. 1/164, 170-71, 3/76). It adjusted these costs when it recorded invoices it received requesting payment for the materials and equipment ordered under the purchase orders (tr. 1/170-72; *but see* tr. 3/107). These inventory costs, such as those on Schedules A, B, and C, were listed in the "direct materials" category of appellant's accounting system (tr. 3/159-60).

64. Appellant's accounts payable accountant prepared a report by (1) running a computer search of its computerized accounting system data base several weeks prior to the hearing to determine the total amount of materials and equipment recorded in the computer for performance under this contract prior to termination and (2) printing out a computer report of the search results (tr. 3/68-72). The print-out report indicates materials and equipment totaling $3,578,082.22 (tr. 3/72; ex. A-16). Only a small portion of this $3,578,082.22 was verified in the record through canceled checks, purchase orders and invoices (ex. A-16 to A-22). DCAA was never provided a copy of the print-out report so that the $3,578,082.22 could be verified (tr. 4/125).

65. The DCAA audit report dated 15 October 1993 points out the following major inadequacies of appellant's accounting system as reflected in its books and records:

> Our audit disclosed inadequacies in their accounting system's internal controls. One inadequacy was the contractor's practice of booking cost when a purchase order was issued, instead of upon receipt of the invoice. Only if there is a difference between the vendor invoice and the corresponding purchase order was an adjustment to the previously booked amount made. This practice is not in accordance with Generally Accepted Accounting Practices (GAAP) and increases the potential for error. Our detailed testing found instances were [sic] these adjustments were not made (see Schedule A-1 Materials and Schedule A-2 Other Direct Costs). This deficiency was also identified in the Independent Certified Public Accountant's (Arthur Anderson & Company) annual report on the contractor's financial statements for the Fiscal Year Ended 30 September 1989. . . . Further we found discrepancies between the expenses claimed by the contractor and those that the contractor submitted with its incurred cost submissions for Fiscal Year 1990.

(*Id.* at 2)

66. The Arthur Andersen and Company report dated 10 January 1991 reviewed appellant's financial statements for fiscal 1989, 1990, and 1991 (ex. G-4). It took the following exception to appellant's accounting system for the purchase of materials for contracts:

> A substantial portion of the Company's contract costs represent materials and supplies purchased from outside vendors. Generally accepted accounting principles require that liabilities and the related costs be recognized when materials are shipped from the applicable vendor and, in some cases, when the materials are received and/or accepted. Included in accounts payable are certain costs for materials and supplies that the Company recorded as liabilities at September 30, 1989, based on the issuance of purchase orders. The materials and supplies were shipped by the vendor subsequent to year-end. . . . The effect of this treatment is to overstate revenue and unbilled receivables by approximately $10,750,000, to overstate contract costs and current liabilities by approximately $9,400,000, and to overstate net income and stockholder's equity by approximately $1,350,000 for the year ended 30 September1989.

67. We are unable to find that appellant's total cost method of establishing the cost of consumables is reliable. Many of the costs recorded as direct material were not verified (finding 64); and the accounting system appears to record costs when purchase orders were issued rather than when costs were incurred (findings 65, 66). More importantly, appellant was afforded the opportunity to identify any consumable costs above the $47,888 not questioned by DCAA and was unable to do so (finding 52).

N. *Direct Labor for Contract Performance*

68. The parties have stipulated that appellant incurred direct labor for contract performance in the amount of $684,343 with $667,017 having been incurred prior to termination and $17,326 after termination (tr. 2/5). As indicated in the DCAA audit report dated 11 May 1994, this direct labor breaks down to $117,910 for fiscal 1988, $277,699 for fiscal 1989, and $288,724 (includes the $17,326) for fiscal 1990 (Supp. R4, tab 5 at 7). We have calculated the direct labor for each overhead area by removing the fringe benefit from the salary and fringe total by overhead area reported in this DCAA report which results for fiscal 1989 in direct labor of $2,221 for Bethesda, MD and

$275,478 for San Antonio; and for fiscal 1990 of $276 for San Antonio and $288,448 for Charleston (*id.* at 8).

O. *Settlement Labor*

69. Appellant seeks $224,428 for settlement labor. In its brief, appellant seeks $12,561 for the fiscal year ending 30 September 1990 (app. br. at 36; findings 75, 76). DCAA did reallocate $12,561 which was recorded by appellant as direct labor in its accounting records but were incurred after termination, and, therefore, reclassified as settlement labor by DCAA (Supp. R4, tab 5 at 7). Thus, the post-termination settlement labor for fiscal 1990 was $12,561. We have allotted this $12,561 to Charleston because it has the lowest indirect rates and the record does not include any other information to perform this allocation.

70. Appellant prepared a report of its labor costs for each fiscal year by (1) running a computer search of its computerized accounting system data base several weeks prior to the hearing to determine the total amount of labor recorded in the computer for performance of tasks under this contract after termination and (2) printing out a computer report of the search results (tr. 1/176, 180-81). Time sheets prepared by each employee and verified by his or her supervisor are how the costs are inputted into the computerized accounting system (tr. 3/44-45).

71. The reports for termination settlement labor from appellant's computerized accounting system indicate $116,997.57 for the fiscal year ending 30 September 1991 (ex. A-5); $61,150.15 for the fiscal year ending 30 September 1992 (ex. A-6); $4,387.91 for the fiscal year ending 30 September 1993 (ex. A-7); $11,694.74 for the fiscal year ending 30 September 1994 (ex. A-8); and $17,636.44 for the fiscal year ending 30 September 1995 (ex. A-9).

72. Some of the settlement labor numbers in appellant's reports from its accounting system were supported by time sheets and others by change in accounting forms (*id.*). None of the supporting data indicates exactly what work was done other than to log the work to a single category denoted as post termination work (*id.*). Some of the change in accounting forms were prepared substantially after the fact by appellant's employees and undated but do provide estimates of various kinds of termination activities by percentage of the total time (*id.*). These forms do list estimated hours by specific date but without any indication of what was done on that date other than that it was for post termination work.

73. During fiscal 1991, appellant's Vice President Hickey spent 75 to 80% of his time assisting outside legal counsel trying to convince the Government to convert the

default termination to one for the convenience of the Government (tr. 3/201, 205, 209; ex. A-118; G-12 at H-1m(1)). He compiled and studied all of appellant's correspondence in its Bethesda, Charleston, and San Antonio offices as well as massive Government correspondence obtained in discovery to determine the chronology of events from contract award through contract termination (*id.*; tr. 3/203-04). He also was the principal interface with DCAA and provided a detailed explanation for DCAA of what work he and three other officers of appellant performed (tr. 3/202-03). He spent a tremendous amount of time trying to match the inventory of direct materials to purchase orders (tr. 3/209-11).

74. Appellant's Vice President Hickey originally had his fiscal 1991 post-termination hours charged to general and administrative (G&A) expenses (tr. 3/48). The accounting for these hours was changed to a termination expense by a Change in Accounting form which he prepared and then signed but did not date, so it is unknown when he signed it (tr. 3/49). It is possible this form was prepared after the close of fiscal year 1991 (tr. 3/53).

75. Vice President Hinkley's change of accounting form indicated that 30% of his hours were reconciling inventory; 10% analyzing purchase orders; 20% preparing for negotiation; 10% preparing correspondence with the Government; 20% in preparing the Contract Disputes Act claim; and 10% for ASBCA/GSBCA support (ex. A-5; tr. 3/49-50). It further indicates that 1,404 hours were transferred during fiscal 1991 to termination tasks (*id.*). These 1,404 hours times Vice President's Hinkley's hourly rate of $37.98 results in $53,323.92 of termination settlement labor without fringes and other indirect costs for fiscal 1991 (*id.*).

76. Based upon the Change in Accounting form, his testimony and narrative, we find that 75% of Vice President Hickey's claimed settlement labor costs was in support of litigation but that 25% of the $53,323.92 which equals $13,331 was in support of the inventory termination task in appellant's Bethesda offices.

77. Rodney Hunt was a marketing employee of appellant who interfaced at the contracting officer level of the Government in an attempt to convince the Government to convert the termination from one for default to one for convenience (tr. 3/206-07). A written narrative prepared by Mr. Hunt for DCAA indicates that he prepared for and briefed Government personnel as to why the termination should be converted (ex. A-119 at 3; G-12 at H-1m(5)). A Change of Accounting Form was prepared after the fact to amend the computerized accounting data to move his hours from G&A to the category for termination labor (ex. A-5, G-12 at H-1a(3)). This form was signed by Hunt, was also undated, and stated in a conclusory fashion that the hours were for negotiation preparation (*id.*). It indicated that Hunt worked 301 hours on termination tasks (*id.*). The report for fiscal 1991 from appellant's computerized accounting system indicates he worked a total

of 480 hours on termination tasks, was paid an hourly rate of $26.44 resulting in settlement labor costs of $12,691.20 without fringes and other indirect costs (*id.*). We find that these costs were in support of litigation in attempting to settle the litigation involving the termination.

78. Jim Wroth performed post-termination work on the contract by preparing, assembling, reviewing, and then presenting cost data to DCAA (tr. 3/206; ex. A-119; G-12 at H-1m(2)). He also assisted in reviewing and assembling cost data for use in settlement proposals (*id.*). He also attended numerous meetings with DCAA and with other appellant personnel concerning the termination (*id.*). His hours were originally charged to marketing overhead but were changed to termination labor after the fact on a change of accounting form (ex. G-12 at H-1a(2)). For fiscal 1991, his hourly rate of $41.80 was applied to the 200 hours resulting in settlement labor of $8,360 without fringes or other indirect costs (ex. A-5). We find that this post-termination settlement labor of $8,360 was performed in Bethesda and in support of the preparation of the convenience termination proposal and assisting DCAA.

79. Appellant's Vice President Hilmi Arslan worked 979 hours in fiscal 1991 with 80% spent on the GSBCA and ASBCA litigation and 20% on the Bell South litigation (ex. A-119; G-12 at H-1m(4)). For the GSBCA and ASBCA litigation, he prepared material, reviewed depositions of Government personnel, reviewed documents obtained in discovery, and prepared and edited appellant's responses to the Government's interrogatories (*id.*). For the Bell South litigation, he reviewed appellant's documentation and depositions of Bell South's witnesses to prepare for being deposed, and reviewed litigation issues with appellant' attorneys (*id.*). For fiscal 1991, his hourly rate of $35.10 was applied to the 979 hours resulting in settlement labor of $34,362.90 without fringes or other indirect costs (ex. A-5). We find that 80% of the this post-termination settlement labor in support of litigation with the Government but that 20% of the $34,362.90 which equals $6,873 was in support of the Bell South litigation and performed in appellant's Bethesda offices.

80. Nine other appellant employees had time sheets indicating that they had performed post-termination tasks in fiscal 1991 (ex. A-5). No evidence was included in the record as to what termination tasks each performed. Thus, we are unable to make any findings concerning these hours.

81. During fiscal 1992 but prior to the conversion of the termination for default into one for convenience, appellant's Vice President Jim Hickey spent a considerable portion of his time working with outside counsel in preparing appellant's initial responses to the Government's interrogatories and assisting in responding to document requests (ex. A-119; G-12 at H-1m(1)). He also assisted outside counsel in the Bell South litigation by

reviewing appellant's correspondence with its subcontractors (*id.*). After the conversion of the default termination, he was the primary in-house employee involved in the preparation of the revised termination for convenience settlement proposal and spent a tremendous amount of time working on it (*id.;* tr. 3/202).

82. Vice President Hickey charged 257 hours on his time sheets as post-termination labor (ex. A-6). The record does not indicate what these tasks were. A Change in Accounting form dated 31 August 1992 transferred 360 hours for Mr. Hickey from G&A to termination labor for fiscal 1992 (*id.*). This form was undated by Mr. Hickey when he signed it but does indicate that 55% of his time was preparing the convenience termination proposal, 10% was assisting with the Bell South litigation, and 35% was working on the inventory of direct property including studying invoices and purchase orders (*id.*). These 617 hours times Vice President's Hinkley's hourly rate of $37.98 results in $23,433.66 of termination settlement labor without fringes and other indirect costs for fiscal 1992 (*id.*).

83. Based upon the Change in Accounting form, his testimony and narrative furnished to DCAA, we find that 50% of his time was in support of litigation with the Government and that 50% of the $23,433.66 which equals $11,717 was for assisting with the Bell South litigation, preparing the inventory, and assisting in the preparation of the convenience termination proposal. These services were performed at appellant's Bethesda offices.

84. During the period of July and August of 1992, appellant's Director of Finance, Allieu Shaw's, predominant work on this project was interfacing with DCAA including selecting and furnishing accounting records such as time sheets and payment records for DCAA review while DCAA was auditing appellant's termination for convenience proposal (tr. 1/175, 3/25, 38, 41-42). He prepared a cost impact analysis and provided reports from appellant's computerized accounting system of direct materials, other direct costs, and labor (ex. A-118; G-12 at H-1m(3); tr. 1/175, 3/26). He also reviewed post-termination costs (tr. 3/27). He provided the cost data for the use of Vice President Hickey in preparing the convenience termination proposal (tr. 3/42-43). He personally kept track of his time even though these costs were originally recorded as an indirect (tr. 3/27). His staff assisted with this effort even though their time was not recorded as direct labor (tr. 3/38-39).

85. A Change of Accounting Form dated 31 August 1992 transferred 80 hours for Mr. Shaw from G&A to post-termination labor (ex. A-6). These 80 hours times Mr. Shaw's hourly rate of $26.44 results in post-termination labor of $2,115. 20 without fringes and other indirect costs performed at appellant's Bethesda offices (*id.*).

86. Appellant's Vice President Hilmi Arslan worked approximately 470 hours for fiscal 1992 in support of outside counsel during the prior termination for default litigation before this Board by reviewing documentation for both sides and assisting with responses to Government interrogatories (ex. A-119; G-12 at H-1m(4)). He also spent approximately 60 hours reviewing depositions taken by appellant's outside counsel in the Bell South litigation and discussing issues with outside counsel (*id.*).

87. Vice President Arslan had time sheets indicating that he worked 4 hours of post-termination labor (ex. A-6). We have been unable to find any evidence in the record indicating what tasks were performed during these hours. A Change in Accounting form transferred 527 hours for Mr. Arslan from bid and proposal costs to post-termination labor (*id.*; tr. 3/56-58). This form indicates that the other 50% of these hours were for work in preparing a settlement proposal, 25% for assisting with the Bell South litigation, and 25% for assisting with the preparation of the termination inventory (*id.*; tr. 3/156-57). These 527 hours times his hourly rate of $37.50 equal $19,762.50 of post-termination settlement labor (ex. A-6). We find that 50% of this post-termination settlement labor was in support of litigation with the Government and that 50% which equals $9,881 was for support of the Bell South litigation, assisting with the inventory, and helping prepare the termination for convenience proposal. These latter tasks were performed in appellant's Bethesda offices.

88. Seven of appellant's employees had time sheets indicating that they performed post-termination labor in fiscal 1992 (ex. A-6). None of these sheets indicated what tasks any performed (*id.*).

89. No details are included in the record as to what termination labor tasks were performed in fiscal 1993. Two employees had work charged to termination without any details (ex. A-7). A single time sheet indicated one employee worked 11 hours but again without any details (*id.*).

90. No details are included in the record as to what termination labor tasks were performed in fiscal 1994. Eight employees had work charged to termination without any details (ex. A-8). Time sheets corroborated the hours for all but one employee who worked only 2 hours but again without any details (*id.*).

91. David Champi, one of appellant's in house attorneys in its Bethesda offices, transferred 285 hours for work performed in fiscal 1995 from G&A to post-termination labor by a Change in Accounting form dated 30 September 1995 (ex. A-9). This form indicated that this labor was for preparing and presenting appellant's termination for convenience proposal to the Government (*id.*). He also worked 139 hours on undefined termination tasks according to time sheets included in the record (*id.*). We find the 285

hours at $24.04 per hour which equals $6,851 as being for assisting with the preparation of the convenience termination proposal (ex. A-9).

92. Three other employees had work charged to termination labor without any details being provided as to what tasks they were for fiscal 1995 (ex. A-9).

93. No details are included in the record as to what termination labor tasks were performed in fiscal 1996. Two employees had work charged to termination labor without any details as to what tasks they were performing (ex. A-9).

94. The accounting department provided its support to all groups of the company (tr. 3/174-75). They prepared job cost reports, pulled invoices and other cost data, and answered questions asked by DCAA (tr. 3/180). Employees of accounting and other support personnel who provided their efforts company wide had their time charged to the indirect cost pool known as General and Administrative expenses (G&A) (tr. 3/39, 175, 182). Thus, no accounting costs were included as direct costs in the termination for convenience proposal except for a few instances where an employee was assigned a project lasting a substantial piece of time (tr. 3/181-82). No double charging occurred because these costs were either charged direct or as a part of the indirect cost pool (tr. 3/176). No specific proof was included in the record of any double charging including the accounting transfers of indirect to direct costs described *infra*.

95. Appellant's employees who performed direct labor on post-termination tasks received assistance from personnel from the accounting department, individual secretaries, and/or other support staff who assisted with the preparation of the termination for convenience claim, retrieved documents, made copies, ran reports and prepared data from the computerized accounting system, worked with the DCAA auditor and termination contracting officer, and responded to the Government requests for information (tr. 3/38-39, 174-76). These costs were charged to G&A (tr. 3/175-76). G&A was allocated by post-termination labor cost's percentage of the total costs which also included post-termination labor for that fiscal year and, therefore, a portion of G&A would not be allocated if these costs were not allocated to post-termination labor (tr. 3/175-76, 180, 186; ex. A-33 at 50). These costs as well as the cost of the supplies and equipment they used such as the computer, its depreciation, and printing supplies would not be recoverable except through the application of G&A to post-termination labor (tr. 3/180-82; ex. A-33 at 50).

96. Support costs for employees performing post-termination labor as a part of an operational group were charged to the overhead for that operational group (tr. 3/175, 183). They included administrative, secretarial, or rental costs to provide office space for employees performing direct labor (tr. 3/184, 186). Post-termination labor for the

operational group was included in total labor for that operational group which was used to allocate overhead (tr. 3/180-81). Thus, overhead for an operational group was allocated by post-termination labor's percentage of direct labor for the operational group and would not be recoverable if overhead for that operational group was not allocated (tr. 3/176-77, 183-84, 186).

97. Appellant's indirect cost pools for G&A and operational overhead were charged the same way for all contracts (tr. 3/186). These indirect rates were loaded to all employees charging direct labor no matter what position they held in the company (tr. 3/186-87). To remove the costs included in the G&A and overhead pools and charge them directly to post-termination labor would cause an inconsistency in the accounting system used for all of appellant's other work and contracts (tr. 3/189).

98. DCAA audited appellant and reclassified $144,830 from performance direct labor and other direct costs to settlement labor to perform the inventory and prepare the convenience termination proposal (Supp. R4, tab 5 at 21). It added the $144,830 to appellant's proposed post-termination labor of $58,838, resulting in proposed post-termination labor of $203,668 (*id.*). It also estimated and allowed $1,200 post-termination labor to turn over the inventory at Charleston (*id.* at 23); $1,200 to turn over inventory at Roosevelt Roads (*id.* at 24); $3,360 for appellant's employees to attend inventory settlement meetings (*id.*); and $2,240 to attend termination settlement meetings (*id.* at 25). Thus, the total estimated labor costs allowed by DCAA was $8,000.

99. DCAA questioned $154,954 of the post-termination labor claimed for performance of the inventory and preparation of the convenience termination proposal which had been transferred by appellant after the fact by journal entries and accounting change requests from indirect costs to post-termination labor for employees Arslan, Hickey, Hunt, Shaw, and Wroth which we have described in detail in our prior findings (Supp. R4, tab 5 at 22). It questioned these costs alleging that they were in support of litigation either against the Government or appellant's subcontractors, they were not originally charged to post-termination labor when appellant had an account set up to charge for this type of labor but were instead charged to indirect accounts, and no corroborating data was provided to support the reasonableness of the hours charged (*id.* at 22). Thus, DCAA allowed $203,668 less $154,954 which is $48,714. We have allocated the $48,714 to Charleston and fiscal 1991 because it had the lowest overhead rate and the record did not provide any other data.

100. DCAA did not question $48,714 of post-termination settlement labor (finding 99) allowed estimated labor costs of $8,000 (finding 98), and approved $12,561 for fiscal 1990 (finding 69). In addition, we have reviewed our prior findings concerning the accounting transfers questioned by DCAA and find the following as either being in

support of the Bell South litigation, assisting with the inventory, or helping prepare the convenience termination claims: $13,331 (finding 76), $8,360 (finding 78), and $6,873 (finding 79) which equals $28,654 for fiscal 1991; $11,717 (finding 83), $2,115 (finding 85), and $9,881 (finding 87) which equal $23,713 for fiscal 1992; and $6,851 for fiscal 1995 (finding 91). The total unburdened post-termination settlement labor for these tasks is $126,493.

P. *Consultants*

101. Appellant had an almost full time consultant with an office at the headquarters for appellant who was a certified public accountant (CPA) and assisted appellant's management with accounting matters (tr. 3/173, 185). He assisted with the Bell South litigation and also reviewed appellant's methods of accounting for costs under this contract after its termination (tr. 3/173-74). In particular, he assisted in the accumulation of data for the inventory portion of appellant's claim (*id.*). He also worked on special projects such as litigation but the record contains no evidence indicating that he worked on any litigation for this contract other then the Bell South (tr. 3/185-86).

102. Appellant's accounting consultant had a contract with appellant to perform services at a fixed rate of $5,000 per month (ex. G-16; tr. 3/190). This contract did not describe the services he was to perform (tr. 4/118). His invoices to appellant were not itemized but were for the flat monthly rate of $5,000 and stated "for accounting and consulting" (ex. G-15; tr. 3/119). He filed no separate report detailing his work (tr. 3/119). However, he kept notes or records of the work he performed for appellant and used them to reconstruct the number of hours he worked on the termination (tr. 3/119, 196). The memorandum dated 28 June 1993 reconstructed the hours he worked on the termination from 1990 through 1993 (ex. A-85; tr. 3/193-94). However, this memorandum does not state the details of what work he performed because of the time lag but does indicate that he billed and was paid $28,500 for the work he performed for appellant (*id.;* tr. 3/196-97).

103. On 31 August 1992, appellant through a ledger journal entry transferred the accounting treatment of the $28,500 which was originally recorded as G&A to a direct termination cost (ex. G-14).

104. Bruce Cargill was another consultant under contract with appellant to perform consulting services at a fixed price of $330 per day (tr. 3/198-99). The only evidence as to the work Mr. Cargill performed for this contract was described on his invoices in detail as litigation support such as drafting and answering interrogatories (ex. A-94, G-17). Appellant's accounting consultant studied these invoices and indicated in a

memorandum that he worked 80 hours on the termination (ex. A-94). No other evidence was included in the record.

105. DCAA audited that portion of appellant's termination claim relating to consulting services and took exception to all of the costs for appellant's accounting consultant because of the lack of detail in his contract and invoices in describing exactly what work he performed and for Mr. Cargill because his services were in direct support of litigation with the Government (Supp. R4, tab 5 at 27).

106. The $28,500 for appellant's accounting consultant's services breaks down to $12,375 for fiscal 1991 and $16,125 for fiscal 1992 (ex. A-85).

Q. *Travel*

107. DCAA approved $3,401 in estimated travel costs incurred in inventoring the equipment and materials and in preparing the termination for convenience settlement proposal (Supp. R4, tab 5 at 21). It also approved estimated travel expenses of $1,036 for turning over the equipment and materials at the Charleston warehouse and $2,230 for doing the same at Roosevelt Roads (*id.* at 23, 24). It similarly approved estimated travel expenses of $2,166 for attending the equipment and material's settlement meeting (*id.* at 24); and $576 for attending a termination settlement meeting (*id.* at 25). Thus, DCAA approved a total of $10,309.

R. *Stipulated Indirect Rates & Profit*

108. The parties stipulated that appellant's overhead by area, fringe, and G&A rates were as follows:

| Fiscal Year | Bethesda | Charleston | San Antonio | Fringe Rate | G&A |
|---|---|---|---|---|---|
| 1988 | 51.15% | n/a | 48.56% | 33.13% | 10.97% |
| 1989 | 77.67% | n/a | 55.23% | 30.31% | 11.10% |
| 1990 | 51.14% | 50.03% | 53.59% | 27.67% | 12.79% |
| 1991 | 47.29% | 31.94% | 46.60% | 30.29% | 11.92% |
| 1992 | 60.29% | 56.20% | n/a | 31.24% | 11.01% |
| 1993 | 49.47% | 41.79% | n/a | 26.92% | 12.58% |
| 1994 | 49.47% | 41.79% | n/a | 26.92% | 12.58% |
| 1995 | 45.33% | n/a | n/a | 28.69% | 18.37% |

(Tr. 2/5-7, 3/62, 63) They have also stipulated that the profit to be applied to appellant's costs is 8.75% (tr. 2/7).

S. *Prior Payments to Appellant*

109. Appellant had been paid progress payments totaling $4,125,678 prior to the termination of the contract. A partial payment of $1,000,000 on the termination for convenience was made on 4 October 1994. The contracting officer determined in her final decision dated 14 February 1995 that a total of $6,364,413 was due as termination for convenience costs (Supp. R4, tab 8). Under this decision, the contracting officer paid appellant an additional $1,238,735 raising the total payments under the contract to $6,364,413.

DECISION

Almost all of the termination settlement costs are in dispute but most of the costs of performance incurred prior to the date of termination are not. The direct labor, direct material, and other direct costs along with their markups were stipulated. The primary issue remaining concerning costs incurred prior to termination is the cost of consumables which has been defined as materials used up or not "left over" during contract performance (finding 51).

I. *Consumables*

At DCAA's request, appellant submitted a report to DCAA containing a list of items which it claimed were consumables for this contract which totaled $52,567.79 (finding 52). DCAA audited this list and found that $47,887.79 was supportable with $4,680 being questioned because a credit for that amount was shown on a purchase order for some of the items on the list of consumables (*id.*). At the hearing and in its briefs, appellant increased the amount it seeks for consumables from $52,567.79 to $542,814.22 (finding 53).

Appellant contends that it is entitled to more than the $47,887.79 approved by DCAA and the $3,211,456 for direct materials which was stipulated by the parties based upon a physical inventory. Appellant points to indications in its computerized accounting system of an additional $30,000 in concrete not listed in the physical inventory and over $100,000 in fencing above that listed in the physical inventory. However, the parties stipulated on the costs for this inventory (finding 49) and including these additional materials would be a violation of that stipulation.

No proof was included in the record as to where the additional fencing or concrete was located or why it was not turned over to the Government. In *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987), recovery for materials for which both

purchase orders and invoices were included in the record was denied when no proof was provided as to what happened to these materials. The Court stated:

> [Appellant] has the burden of proof on any cost item of its claim which for those items, includes proof, *inter alia*, that the materials were not kept by the contractor or sold. It may not recover simply by pleading ignorance of the fate of those materials.

828 F.2d at 768.

We turn to appellant's principal argument which is that the recoverable cost of consumables is $366,626.22 which is the difference between what was recorded in its computerized accounting system for direct materials less what it stipulated for direct materials based upon the physical inventory (finding 53). It increases the $366,626.22 to $542,814.22 by the $176,188 DCAA found in auditing "other direct costs" to be duplicates of items included in the stipulated cost of direct materials resulting from the physical inventory (findings 53, 57). We are unable to sustain this $176,188 adjustment because it would alter the stipulation of the costs for both "other direct costs" and well as for "direct materials." Thus, the issue remains whether appellant can recover the $366,622.22 under a method which appears to us to be a total cost method of valuing consumables.

A major difficulty with appellant's approach is lack of accountability. It assumes that the difference is consumables without satisfying the requirements of *Lisbon Contractors, Inc., supra* of specifically identifying the materials and where they were used up. Even were this hurdle overcome, appellant's proposed method assumes that the computer report is adequate proof of what materials were purchased for the project. We have previously held that they are not, without adequate backup accounting data. *Tubergen and Associates, Inc.*, ASBCA No. 34106, 90-3 BCA ¶ 23,058. Only a small portion of appellant's claimed costs for purchased materials was verified (finding 64). Moreover, both DCAA and appellant's own accounting firm raised serious questions about the accuracy of its accounting system in reporting the purchase of materials (findings 65,66). Thus, we hold under the circumstances of this record that the total cost method cannot be used (finding 67) and that appellant is limited to $47,888 for consumables.

II. *Legal Expenses*

Appellant has incurred legal expenses relating to its performance under the contract as well as expenses relating to the termination and the preparation of the convenience termination proposal. We analyze these issues separately as different rules apply.

A. *Performance Legal Expenses*

The Termination for Convenience clause requires that the contracting officer pay appellant for the costs it incurred in the performance of the work terminated (finding 3). Defending against suits by subcontractors concerning work performed under the contract even if filed after termination appear to be either costs of performance or continuing costs of performance as covered by FAR 31.205-42(b) (finding 4). These suits do not involve the Government as a party and thus do not appear to be controlled by FAR 31.205-33(d) which makes prosecuting claims against the Government unallowable (finding 4).

Performance costs are recoverable under FAR 31.201-2 if they are reasonable, allocable to the contract, and not prohibited (finding 4). Costs are reasonable if they are the type "recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance" and their nature and amount "does not exceed that which would be incurred by a prudent person in the conduct of competitive business (*id.*)." They are allocable to this contract under FAR 31.205-4 if "incurred specifically for the contract (*id.*)."

The incurring of legal fees to defend against another bidder's protest against a contractor's low bid was held to meet these standards and to defeat a Government argument that the expenditures did not benefit the contract work, *Jana, Inc.*, ASBCA No. 32447, 88-2 BCA ¶ 20,651, as were legal fees incurred for an unsuccessful defense to a Title 7 action by a female employee for promoting a male employee rather than the female employee. *Hirsch Tyler Co.*, ASBCA No. 20962, 76-2 BCA ¶ 12,075. *See also Northrop Worldwide Aircraft Services, Inc.*, ASBCA Nos. 45216 *et al.*, 95-1 BCA ¶ 27,503, where the incurring of legal fees in defense of a suit for improper employee firing was held to benefit the contract work, rejecting a Government assertion that they were not. However, the Federal Court held that the legal fees did not benefit the Government after it was established that the fired employees' allegations that the contractor had ordered them to submit fraudulent quality assurance reports were true. *Caldera v. Northrop Worldwide Aircraft Services, Inc.*, *slip op.* No. 98-1500, Fed. Cir. 10 Sept. 1999, *pet. for rehearing filed*, 21 Oct. 1999.

1. *Bell South Litigation*

We turn now to the *Bell South* litigation. *Bell South* was a subcontractor which had agreed to provide the monitor and control system for each security system to be furnished by appellant under the contract (finding 32). It had been unable to deliver a conforming monitor and control system prior to the initial termination for default (finding 33). It sued appellant in the United States District Court for the contract price shortly after the termination (finding 34). Appellant returned the defective monitor and control system to *Bell South* and defended against the legal action (*id.*). Both the District Court and the 4th Circuit held that the goods were non-conforming and that appellant was not liable (findings 35, 36). Appellant incurred and paid $353,950 in legal fees in defending itself in this legal action and appeal (finding 37).

The Government did not challenge the amount of the legal fees but claimed that it was not liable for these fees because appellant selected *Bell South*, making appellant liable for its defective performance, pointed out that the Government in no way contributed to *Bell South's* non-conforming performance, and that *Bell South's* defective work did not benefit the contract. It relied on *Lea County Construction Co.*, ASBCA No. 13964, 72-1 BCA ¶ 9298 and *Noland Brothers, Inc. v. United States*, 437 F. 2d 1371, 1391-92 (Ct. Cl 1971). The *Lea County Construction* case involved a Changes claim under a fixed price contact and not a termination for convenience recovery. The *Noland Brothers* case did involve a termination for convenience where legal fees were allowed but the Court did examine whether the legal action by the subcontractor for damages to barges leased for use under the contract involved negligence in their use by the contractor. Neither case appears pertinent here.

The *Bell South* litigation clearly involved work performed under this contract and, therefor, the legal fees in defending this suit are allocable to this contract. In addition, it is reasonable for a contractor to defend itself when a subcontractor's performance is non-conforming. The Government's arguments that defective work does not benefit the contract and, therefor, the costs of litigation are not allocable to the contract are without merit. See, *e.g.*, *Jana, Inc.*, ASBCA No. 32447, *supra*. Accordingly, we allow these legal fees.

2. *Electric Wire Litigation*

The Perry Mann litigation involved a wiring supplier's legal action seeking payment for wiring ordered and delivered under a purchase order. The purchase order contained a clause stating that payment was due "15 days after appellant was paid by the Government" but also had a hand written note stating "Net 60" (finding 44).

After termination, appellant attempted to return the wiring claiming that it had not been used in the contract work (finding 44). Perry Mann sued appellant for the purchase price (*id.*). Appellant defended on the ground that it did not owe the purchase price until 15 days after it was paid by the Government (*id.*). The United States District Court held that the term "Net 60" on the purchase order controlled over the clause relied upon by appellant and determined that appellant owed the purchase price which was due 60 days after invoice (finding 46).

The wiring clearly was furnished to appellant as a part of the performance under the contract and, therefor, the legal fees relating to payment for this wiring were allocable to the contract. The basic issue was whether it was reasonable for appellant to defend itself when the term "Net 60" was on the purchase order. The issue in litigation as to which clause in the purchase order governed payment was not frivolous, making it unclear whether appellant owed the supplier prior to the decision to the contrary. Thus, we hold that it was reasonable for appellant to defend its position as to payment and its legal fees in so doing are allowable.

3. *Inventory Storage Litigation*

This litigation involved appellant's landlord suing for unpaid rent for the warehouse space where the termination inventory was stored. Appellant had notified the landlord that it was vacating this warehouse space but the inventory was not removed by the date indicated in appellant's notice that it was vacating (finding 40). It stopped paying rent when the landlord denied access to the space and demanded the higher rent it expected to collect when appellant failed to vacate as promised (*id.*). Appellant retained counsel to defend against the landlord's legal action for unpaid rent it promised to pay as specified in its lease (finding 43). We deny any recovery for these legal fees both for lack of proof as to what legal fees were paid for these services (*id.*) and because we hold that the litigation expenses were unreasonable because appellant clearly owed the rent for the space it occupied.

B. *Termination Legal Fees & Disputes Act Interest*

Paragraph (e) of the Termination for Convenience clause requires the appellant to prepare a convenience termination claim with supporting data which would include preparation of the inventory schedules (finding 3). The Government in paragraph (f)(3) promises to pay appellant for the preparation of this termination proposal including accounting and legal fees (*id.*). FAR 31.205-42(g)(i) also makes payment for these services allowable (finding 4).

The contracting officer terminated the contract for default on 21 June 1990 (finding 6) which appellant through its attorney's appealed to this Board (finding 8). Its attorney's filed a convenience termination proposal certified under the Contract Disputes Act on 14 December 1990 (finding 9). A contracting officer final decision was issued and an appeal was taken to this Board (*id.*). Prior to the hearing, the contracting officer converted the default termination to one for the convenience of the Government on 3 January 1992 (finding 20) and directed appellant to resubmit its convenience termination proposal (finding 21). Appellant's revised convenience termination proposal was submitted on 28 July 1992 (*id.*). Paragraph (g) of the Default clause makes the default termination one for convenience as of the time of the default termination when the contracting officer converted the default to one for the convenience of the Government.

The Government contends that the attorney fees expended to prepare and submit these various convenience termination proposals are unallowable as the prosecution of claims against the Government because appellant converted them to Disputes Act claims by certifying them so that it could claim Disputes Act interest. However, both the preparation of these claims and the performance of the inventory were tasks specifically required to be performed by the Termination for Convenience clause for which payment was promised by both the contract and FAR.

FAR 31.205-33(d) provides that the "costs of legal, accounting, and consultant services and directly associated costs incurred in connection with . . . the prosecution of claims or appeals against the Government (see 33.201) are unallowable (but see 31.205-47)." The term "claims" in this regulation was held to be Disputes Act claims because of its reference to FAR 33.201 which is the regulatory definition of a Disputes Act Claim. *Bill Strong Enterprises v. Shannon*, 49 F. 3d 1541, 1549 (Fed. Cir. 1995); *Bos'n Towing & Salvage Co.*, ASBCA No. 41357, 92-2 BCA ¶ 24,864 at 124,034. The *Bill Strong* decision holds that without a Disputes Act claim this regulatory disallowance is not applicable, that an equitable adjustment claim which is not in dispute is not a Disputes Act claim, and that consulting fees in preparing an equitable adjustment claim were allowable.

Subsequently, the Federal Circuit reversed itself and held that equitable adjustment claims could be Disputes Act claims even though they were not in dispute. *Reflectone, Inc. v. Dalton*, 60 F. 3d 1572 (Fed. Cir. 1995). On the remand to this Board of *Bill Strong*, the Government argued that *Reflectone* changed the result in *Bill Strong* by eliminating the requirement for a dispute before a claim could be a Disputes Act claim. However, the *Bill Strong* decision had further pointed out that the attorney or consulting fees are only unallowable when a further requirement that the costs be "incurred in connection with . . . the prosecution of claims" is met. 49 F. 3d at 1549-50. The Federal Circuit stated that the purpose for which the cost was incurred must be examined to

determine whether the costs were incurred for performance or contract administration which are allowable or for litigation which is not. *Id.* This Board followed this language in holding that even though a Disputes Act claim was filed and the parties were in litigation that evidence must be taken to determine whether the costs were incurred for the purpose of litigation or contract administration. *Bill Strong Enterprises, Inc.*, ASBCA No. 42946, 96-2 BCA ¶ 28,428.

The Federal Circuit notes in footnote 6 of *Bill Strong* that consulting costs incurred in settlement of claims made when a contract is terminated for convenience are generally allowable and cites with approval *Acme Process Equip. Co. v. United States*, 347 F. 2d 538, 544-45 (Ct. Cl. 1965) and *Baifield Industries*, ASBCA No. 20006, 76-2 BCA ¶ 12,096 at 58,102-04 which both held that attorney fees incurred after litigation on the termination commenced were allowable because the costs were incurred for the purpose of settlement at the administrative level rather than for litigation. Also see *Kalvar Corp. v. United States*, 543 F. 2d 1298, 1305 (Ct. Cl. 1976) where the court allowed the attorney fee costs of preparing a brief outlining a contractor's convenience termination costs after the Court converted a default termination to one for the convenience of the Government.

Applying these principles, we hold that there is a strong presumption for allowability when the contract requires the work such as the preparation of the termination for convenience proposal and the supporting schedules such as the inventory. The act of certifying the convenience termination claim and requesting a final decision of the contracting officer was for the purpose of recovering interest rather than for initiating litigation as was demonstrated by the many attempts to settle the claim at the administrative level even though appellant was not "unduly optimistic about the prospects for reaching a mutually satisfactory settlement." *Richerson Construction, Inc.*, GSBCA Nos. 11161 *et al.*, 93-1 BCA ¶ 25,239 at 125,712-13, *reconsid. granted in part (*not on this issue*)*, 93-3 BCA ¶ 26,206 at 130,438-39. Accordingly, we hold that appellant is entitled to legal fees for its assistance in these tasks as well as interest on its claim under the Disputes Act.

On the other hand, a strong presumption against recovery of legal fees and consultant costs is present when litigation has commenced and none of the tasks are required by the contract. Thus, we deny any recovery for appellant's costs in attempting to overturn the default termination, for preparing litigation documents, performing discovery, and other clear litigation tasks. Insufficient evidence was presented to overcome this presumption.

Appellant's argument that it would not have incurred these costs but for the improper termination must be denied. It is an attempt to recover breach damages which

are barred by the convenience termination clause. *John Reiner & Co. v. United States*, 325 F. 2d 438 (Ct. Cl. 1963).

C. *Reprocurement Bid Protest Legal Fees*

After appellant was terminated for default, it submitted a bid on the reprocurement but the contracting officer rejected its bid and awarded the contract to another firm (findings 27, 28). Appellant's attorneys filed a protest with the GSBCA which was dismissed for lack of jurisdiction (findings 29, 30). They filed an appeal to the Court of Appeals for the Federal Circuit (finding 30). Appellant paid $83,698 for these legal services in presenting its appeal to the GSBCA and the Federal Circuit (finding 31).

Appellant argues that this litigation was not the prosecution of a Disputes Act claim and is recoverable as either a performance or termination cost. It is correct that a bid protest is not the prosecution of a Contract Disputes Act claim even though it is clearly litigation. *Bos'n Towing & Salvage Co.*, ASBCA No. 41357, 92-2 BCA ¶ 24,864 at 124,034; *Bill Strong Enterprises v. Shannon*, 49 F. 3d 1541, 1549 (Fed. Cir. 1995). However, the protest was not filed with respect to appellant's contract, but for a new, replacement contract. Thus, it is not a performance or termination cost under the terms of appellant's contract.

It is true that the reprocurement would not have occurred, as appellant contends, without the improper termination. However, this once again is an argument for breach of contract damages which are barred by the convenience termination clause. *John Reiner & Co. v. United States*, *supra*. Thus, these legal fees are not allowable.

III. *Termination Labor*

Appellant seeks $224,428 for settlement labor. It set up an account to record termination labor activities after termination (finding 72). However, some of the labor tasks involved support for litigation concerning the termination for default as well as other post-termination activities discussed *infra*. Appellant's accounting system did not distinguish between these litigation activities and the activities required by the contract (*id.*).

The Government contends that some of these activities were in support of the prosecution of claims against the Government and, therefor, not allowable. It further argues that the failure to segregate these unallowable costs results in the disallowance of all settlement labor costs. However, the Government audited appellant's post-termination labor account and determined that $48,714 could not be questioned for this reason (findings 108-10). It also approved estimated labor costs of $8,000 for travel and

other expenses to negotiate the termination settlement costs as well to turn over the inventory and negotiate its value (finding 98, 100). It also reallocated $12,561 from direct costs to post-termination labor because the costs were incurred after termination (finding 70). We hold that these costs totaling $69,275 are recoverable.

We turn now to the $154,954 in salaries for appellant's officers and high level employees which was questioned by the Government because these costs were first recorded in an indirect account and then removed from these indirect accounts and transferred to the post-termination labor account (finding 99). The Government also challenges these costs because some involved unallowable claim prosecution costs, the unallowable costs were not segregated from allowable costs in appellant's accounting system, and there was a lack of corroborating data (*id.*).

It is true that appellant's officers and high level employees who worked on termination tasks did not have these tasks separately recorded in the accounting system (finding 72). However, the change in accounting forms transferring their hours from indirect to direct costs did contain estimates as to percentages of time spent on the various tasks (findings 74, 75, 77, 78, 82, 85, 87, and 91). More importantly, detailed testimony described the termination work these officers and high level employees performed and all furnished written narratives to DCAA describing their termination activities (findings 73, 77-79, 81, 84, and 86). From this evidence, we were able to allocate the allowable termination tasks involving supporting the Bell South litigation, assisting with the termination inventory, assisting DCAA with their audit, and preparing, amending, and negotiating the convenience termination claim (findings 76-78, 83-85, 87, and 91).

The Government argues that the after the fact accounting transfers from indirect to direct labor *might* result in duplicative cost recovery. However, the record contains no specific proof of any duplicative costs but does contain unrebutted testimony that there were none (finding 94).

We allow $57,218 for appellant's officers and high level employees, which when added to amounts approved by the Government during the audit in the amount of $69,275 results in a total of $126,493 in unburdened post-termination settlement labor (finding 100).

IV. *Termination Consultants*

The Government contends that none of appellant's consultant's fees are allowable because of lack of details and because some of the fees were in support of the prosecution of claims against the Government. We have found that all of fees for Bruce Cargill were

in direct support of litigation against the Government and hold that they are not allowable.

On the other hand, appellant's accounting consultant testified that he assisted with the Bell South litigation and with appellant's accounting of the costs incurred after termination (finding 101). He billed and was paid fixed fee by the number of days worked but kept notes of the work he performed on this contract after termination (finding 102). Although he could not detail the work on a daily basis, he was able to estimate what work he had performed over the period in question (*id.*). We hold that this is sufficient for recovery and allow the $28,500 he was paid by appellant (*id.*).

V. *Storage Costs*

Clause (b)(8) of the Termination for Convenience clause requires that appellant "take any action that may be necessary . . . for the protection and preservation of the property related to this contract that is in the possession of the Contractor and in which the Government has or may acquire an interest." (Finding 3) Appellant stored most of the inventory for contract performance in a warehouse in Charleston, South Carolina (findings 10, 38). Based on the only available evidence, we have found that appellant used 75% of the space in the warehouse to store the inventory for this contract (finding 42).

Appellant initially charged the rent for this space to G&A from the date of the default termination on 21 June 1990 until 31 December 1991 (finding 41). We were unable to determine that the rent for this period was not recovered as a part of G&A (*id.*). Accordingly, we hold that they cannot be recovered as additional direct costs for this period.

Appellant charged these rental costs as direct costs from the 1 January 1992 until 6 December 1994 when the inventory was transferred to the Government (finding 41). The Government contends that these costs were unreasonably incurred because the inventory should have been turned over to the Government shortly after the default termination. The parties were clearly in dispute as to what materials were in that inventory and its value (findings 6 to 23, 39). However, the Government stated to appellant at various times that it had a right to receive the inventory independent of agreement on its value (findings 13-15, 22). Both the Default and Convenience Termination clauses require appellant to transfer the inventory and make agreement on value subject to the Disputes process (finding 3). Of course, appellant is entitled to a reasonable period of time to document its claim for inventory value. It had from 21 June 1990 until 31 December 1991 when it was charging storage costs as G&A to prepare this

documentation. The delay in making this transfer after 31 December 1991 was unreasonable and we deny any further recovery of storage costs..

VI. *Travel Expenses*

The Government contests any recovery for travel expenses to inventory and turn that property over to the Government as well as for preparing and negotiating the convenience termination proposal because of appellant's reliance on computer generated records. However, DCAA approved estimated costs in the amount of $10,309 for performing these tasks (finding 107). Accordingly, we hold that appellant is entitled $10,309 for travel costs.

VII. *Indirect Costs*

The Government contends that indirect costs including both G&A and overhead are not allowable for any of the post termination settlement costs. It points to FAR 31.205-42(g)(iii) which provides as follows:

> Indirect costs related to salary and wages incurred as settlement expenses in (i) and (ii); normally, such indirect costs shall be limited to payroll taxes, fringe benefits, occupancy costs, and immediate supervision costs.

(Finding 3)

The limitation on indirect costs provided by FAR 31.205-42(g)(iii) is by its terms limited to "salary and wages." Thus, we hold that appellant is entitled to indirect costs on its allowable legal fees, storage, travel, and consultant costs. *Baifield Industries*, ASBCA No. 20006, 76-2 BCA ¶ 12,096 at 58,116-17; *Thiokol Chemical Corp.*, ASBCA No. 17544, 76-1 BCA ¶ 11,731.

We turn now to the issue of whether indirect costs may be applied to appellant's direct post termination labor. As appellant points out, this labor was supported by its accounting department, office space was provided for them to work, its computer system was used in this labor, and secretarial and other support services were provided to assist them which were all part of indirect cost pools allocated by direct labor (findings 94 to 97). Moreover, no duplicative costs were charged and to charge them as direct costs would cause an inconsistency in appellant's accounting system (findings 96-97). Nevertheless, we are unable to sustain their allowance because of the limitations of FAR

31.205-42(g)(iii). Thus, we deny recovery of indirect costs for post termination direct labor.

VIII. *Calculation of Quantum*

We calculate the direct labor with fringe benefits, overhead and G&A utilizing the direct labor at finding 68 and the rates at finding 108 as follows:

| | FY 1988 San Antonio | FY 1989 Bethesda | FY 1989 San Antonio | FY 1990 San Antonio | FY 1990 Charleston |
|---|---|---|---|---|---|
| Direct Labor | $117,910 | $2,221 | $275,478 | $276 | $288,448 |
| Fringe Rate | 30.31% | 30.31% | 30.31% | 27.67% | 27.67% |
| Fringes | $36,264 | $673 | $83,497 | $76 | $79,814 |
| Total | $157,174 | $2,894 | $358,975 | $352 | $368,262 |
| OH Rate | 48.56% | 77.67% | 55.23% | 53.59% | 50.03 % |
| Overhead | $76,324 | $2,248 | $198,262 | $189 | $184,241 |
| Total | $233,498 | $5,142 | $557,237 | $541 | $552,503 |
| G&A Rate | 10.97% | 11.10% | 11.10% | 12.79% | 12.79% |
| G&A | $25,615 | $566 | $61,296 | $69 | $70,665 |
| TOTAL | $259,113 | $5,708 | $618,533 | $610 | $623,168 |

The total direct labor with fringes, overhead, and G&A is the sum of the figures on the bottom line which equals $1,507,132.

The material portion is the sum of direct materials (finding 49) and consumables (finding 67) plus G&A (finding 49) which is as follows:

| | |
|---|---|
| Schedules A, B, & C | $3,211,456 |
| Consumables | $47,888 |
| Total | $3,259,344 |
| G&A Rate | 11.62% |
| G&A | $378,736 |
| TOTAL | $3,638,080 |

The calculation of other direct costs (finding 50) with the appropriate G&A for the fiscal year (finding 108) is as follows:

| | FY 1988 | FY1989 | FY 1990 |
|---|---|---|---|
| Other Direct Costs | $133,995 | $175,774 | $221,149 |
| G&A Rate | 10.97% | 11.10% | 12.79% |

| | | | |
|---|---|---|---|
| G&A | $14,699 | $19,511 | $28,285 |
| TOTAL | $148,694 | $195,285 | $249,434 |

The total other direct costs plus G&A is the sum of the figures on the bottom line which equals $593,413.

The calculation for direct settlement labor for the fiscal year ending 30 September 1991 at appellant's Bethesda offices is as follows:

| Employee | Amount Allowed | Finding Number |
|---|---|---|
| Hickey | $13,331 | 76 |
| Hunt | $0.00 | 77 |
| Wroth | $8,360 | 78 |
| Arslan | $6,873 | 79 |

TOTAL $28,564

The calculation for direct settlement labor at appellant's Bethesda offices for the fiscal year ending 30 September 1992 is as follows:

| Employee | Amount Allowed | Finding Number |
|---|---|---|
| Hickey | $11,717 | 83 |
| Shaw | $2,115 | 84 |
| Arslan | $9,881 | 87 |

TOTAL $23,713

The calculation for direct settlement labor at appellant's Bethesda offices for the fiscal year ending 30 September 1995 is as follows:

| Employee | Amount Allowed | Finding Number |
|---|---|---|
| Champi | $6,851 | 91 |

To this actual direct labor, we add the estimated labor for the turnovers in Charleston ($1,200) and Roosevelt Roads ($1,200), the equipment settlement meeting ($3,360), and the termination settlement meeting ($2,240) as described in finding 98. The total direct settlement labor for fiscal 1995 is $14,851.

We calculate the direct settlement labor with fringe benefits utilizing the direct settlement labor described above and the rates at finding 108 as follows:

| | FY 1990 Charleston | FY 1991 Charleston | FY 1991 Bethesda | FY 1992 Bethesda | FY 1995 Bethesda |
|---|---|---|---|---|---|
| Direct Labor | $12,561 | $48,714 | $28,564 | $23,713 | $14,851 |
| Fringe Rate | 27.67% | 30.29% | 30.29% | 31.24% | 28.69% |
| Fringes | $3,476 | $14,755 | $8,652 | $7,408 | $4,261 |
| Total | $16,037 | $63,469 | 37,216 | 31,121 | $19,112 |

The total settlement labor with indirect rates applied is $166,955.

We calculate the allowable legal fees by fiscal year as follows:

| Legal Activity | FY 1990 | Finding Number |
|---|---|---|
| Contract Advice | $1,350 | 24 |
| Perry Mann | $1,009 | 48 |
| TOTAL FY 1990 | $2,359 | |

| Legal Activity | FY 1991 | Finding Number |
|---|---|---|
| Contract Advice | $10,953 | 24 |
| Bell South | $117,106 | 37 |
| Perry Mann | $8,622 | 48 |
| TOTAL FY 1991 | $136,681 | |

| Legal Activity | FY 1992 | Finding Number |
|---|---|---|
| Contract Advice | $5,540 | 25 |
| Bell South | $177,598 | 37 |
| TOTAL FY 1992 | $183,138 | |

| Legal Activity | FY 1993 | Finding Number |
|---|---|---|
| Bell South | $49,347 | 37 |
| TOTAL FY 1993 | $49,347 | |

| Legal Activity | FY 1994 | Finding Number |
|---|---|---|
| Contract Advice | $1,828 | 25 |
| Bell South | $10,000 | 37 |
| TOTAL FY 1994 | $11,828 | |

We calculate burdened allowable legal fees by fiscal year by applying the applicable G&A rates at finding 108 as follows:

| | FY1990 | FY 1991 | FY1992 | FY 1993 | FY 1994 |
|---|---|---|---|---|---|
| Legal Fees | $2,359 | $136,681 | $183,138 | $49,347 | $11,828 |
| G&A Rate | 12.79% | 11.92% | 11.01% | 12.58% | 12.58% |
| G & A | $302 | $16,292 | $20,163 | $6,208 | $1,488 |
| Total | $2,661 | $152,973 | $203,301 | $55,555 | $13,316 |

The total amount of legal fees burdened with G&A is $427,806.

We calculate the other settlement expenses of consultants (finding 106) and travel (finding107) with the appropriate G&A rate (finding 108) as follows:

| | FY 1991 | FY 1992 | FY 1995 |
|---|---|---|---|
| Consultants | $12,375 | $16,125 | |
| Travel | | | $10,309 |
| Total | $12,375 | $16,125 | $10,309 |
| G&A Rate | 11.92% | 11.01% | 18.37% |
| G & A | $1,475 | $1,775 | $1,894 |
| TOTAL | $13,850 | $17,900 | $12,203 |

The total other settlement expenses with indirect burden is $43,953.

We find that the amount due by adding the following loaded with indirect rates and subtracting the amount already paid as follows:

| | Amount |
|---|---|
| Direct Labor | $1,507,132 |
| Direct Material | $3,638,080 |
| Other Direct Costs | $593,413 |
| Total | $5,738,625 |
| Profit (8.75%) | $502,130 |
| TOTAL PERFORMANCE | $6,240,755 |
| Direct Settlement Labor | $166,955 |
| Allowable Legal Fees | $427,806 |
| Other Settlement Expenses | $43,953 |
| TOTAL SETTLEMENT | $638,714 |
| TOTAL ALL COSTS | $6,879,469 |
| Previous Payments | $6,364,413 |
| Additional Recovery | $515,056 |

*CONCLUSION*

The appeal is sustained in the amount of $515,056 but denied in all other respects. Disputes Act interest is allowed from the date the contracting officer received the 14 December 1990 certified convenience termination claim (finding 9).

Dated: 18 November 1999

JOHN I. COLDREN, III
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

ALAN M. SPECTOR
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 42659, Appeal of Information Systems & Network Corp., rendered in conformance with the Board's Charter.

Dated: 19 NOV 1999

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals